IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

EDISON A. BROOKS

     Plaintiff

v.

CHIEF TIMOTHY CODISPOTI;
OFFICER GARY MOLLICK; OFFICER
CHARLES CAPELLI; VINELAND
POLICE DEPARTMENT; CITY OF
VINELAND; and John Doe,
(fictitious name),

     Defendants

CIVIL NO. 12-05884(NLH)(JS)

**OPINION**

**APPEARANCES**

LINDA L. CAMPBELL
KEARNEY & ASSOCIATES, P.C.
210 WHITE HORSE PIKE
P.O BOX 279
HADDON HEIGHTS, NJ 08035

    On behalf of Plaintiff Edison A. Brooks

MICHAEL E. BENSON
BUONADONNA & BENSON
1138 EAST CHESNUT AVENUE
SUITE 2A
VINELAND, NJ 08360

    On behalf of Defendant Chief Timothy Codispoti and
    Defendant City of Vineland

JUSTIN ROBERT WHITE
TESTA HECK SCROCCA & TESTA, PA
424 W. LANDIS AVENUE
VINELAND, NJ 08360

    On behalf of Defendant Gary Mollik and Defendant Charles
    Capelli

1

**HILLMAN**, District Judge

This case involves claims of excessive force and racial profiling by law enforcement officers.  Presently before the Court are the Defendants' motions for summary judgment.  For the reasons expressed below, Defendant Gary Mollik and Defendant Charles Capelli's motion for summary judgment will be granted in part and denied in part.[1]  Defendant Timothy Codispoti and the City of Vineland's motion for summary judgment will be granted.

**A. Background**

**1.    Events of March 2, 2011**

This events of this case arose out of a traffic stop.[2]  On March 2, 2011, Plaintiff Edison A. Brooks, who is black, was coming home from work as a barber when he stopped at Bennigan's for a glass of wine. (Deposition of Edison Brooks "Brooks Dep." at 50:14-16, 52:5-30).  As Brooks left Bennigan's, around 7:00 p.m., he saw Defendant Mollik and Defendant Capelli in an

---

[1] While the caption incorrectly spells Mollik as "Mollick," the Court will use the corrected spelling, as explained in the Defendants' Answer to the Complaint.

[2] The Court notes that Defendants Mollik and Capelli failed to e-file their Statement of Facts pursuant to Local Civ. R. 56.1 until after the briefing.  In a letter to the Court, Defendants declared that a hard copy of the statement was served to all parties within the appropriate time frame.  [Docket Item 88].

unmarked police vehicle. (Id. at 50:4, 11, 56:17-19).  He
testified that he knew Defendants were police officers because
of the way they both looked at him when they passed in front of
his car. (Id. at 58:1-4, 14-22, 73:8-24).  Defendants testified
that they pulled out behind Plaintiff and followed him.
(Deposition of Gary Mollik "Mollik Dep." at 33:14-34:2).

Defendants, who are white, are members of the Vineland
Police Department's Street Crimes Unit. (Def. Mollik and
Capelli's Statement of Material Facts "Def. SMF" at 3).
Defendants testified that they believed they saw an air
freshener hanging from Plaintiff's review mirror. (Def. SMF at
3-4).  They believed the air fresher could violate New Jersey
Motor Vehicle Code prohibiting the obstruction of a driver's
view.  (Id.)  Both Mollik and Capelli testified that it was dark
and they could not tell if Plaintiff was black or male.
(Deposition of Charles Capelli "Capelli Dep." at 92:2-7; Mollik
Dep. at 33:6-7).  Brooks testified there was no air freshener
hanging from his review mirror. (Brooks Dep. at 54:21-24).

Plaintiff drove up to his house, parked on the street, and
got out of his car. (Brooks Dep. at 68:15-19).  Defendants claim
that they put their lights and sirens on to pull Plaintiff over
prior to Plaintiff parking in front of his house. (Capelli Dep.
at 89:15-90:6; Mollik Dep. at 36:20-25, 37:2-9).  Plaintiff
testified that he did not see the officers until he was already

parked and out of the car. (Brooks Dep. at 68:17-19.)  Plaintiff
and Defendants versions of the events diverge significantly at
this juncture.

According to Plaintiff, Defendants arrived and yelled at
him to get back into the car. (Brooks Dep. at 70:13-16).  He
froze, put his hands in the air, and asked "what are you
stopping me for?" (Id. at 70:13-16, 75:1-8).  Defendants were
pointing at him as they approached, but he was not sure if they
had their guns drawn. (Id. at 75:18-20).

Plaintiff, identifying the officers as the shorter and the
taller officer, claims that [Mollik] approached him, "grabbed
me, turned me around, pulling my arms down, slammed me on my car
hood, and my glasses flew off." (Id. at 76:22-24).  He heard
Mollik tell him he was under arrest. (Id. at 81:8-13).  Capelli
then punched him in the eye twice. (Id.)

Plaintiff called for his girlfriend to help him and be a
witness. (Id. at 82:1-3.)  After he called for her, Defendants
continued to punch Plaintiff. (Id.)  Plaintiff testified that he
"got down on the ground" to protect himself from the blows and
stumbled towards his house. (Id. at 82:5-25).  While he was
down, he felt a nightstick or flashlight hit his left hand.
(Id.)  Plaintiff testified that when he felt the object hit his
hand, he came up. (Id. at 84:19-85:2).

Plaintiff testified that Mollik placed him in a headlock. (Id.)  While he was in a headlock, Capelli punched Plaintiff in the face. (Id. at 85:14-23.)  Plaintiff felt something hard, "the butt of a round object smash me right in my face." (Id.) Plaintiff testified that this split his skin, causing a loss of blood and Plaintiff to soil his pants. (Id. at 86:8-10).

Plaintiff fell to the ground, and Capelli put him in a chokehold while Mollik grabbed his arm and told him to stop resisting. (Id. at 87:4-20).  He testified that Mollik was "yanking my arm like a jackhammer." (Id.)

Plaintiff's girlfriend Gladys Santiago, Plaintiff's three children, and Plaintiff's pit bull came outside when Plaintiff Brooks was already on the ground. (Brooks Dep. at 88:1-20). Santiago thought it looked like the Defendants were trying to break Plaintiff's arm, "because one arm was here and the other one was like bent backwards but pushed up." (Deposition of Gladys Santiago "Santiago Dep." at 17:2-18, 18:2-5).

Defendants do not dispute that force was used to arrest the Plaintiff. (See Def. SMF).  Defendants admit that Capelli punched Plaintiff in the face near the front of the car, chased after Plaintiff, and punched him in the face again. (Capelli Dep. at 101:15-102:16).  Defendants state that when Plaintiff was on the ground, Capelli struck Plaintiff three to five times and Mollik struck him once. (Def. SMF. at 6).

However, Defendants disagree about many of the remaining material facts.  Capelli testified that after he told Plaintiff to get back in his vehicle, Plaintiff put one hand up in the air "like he is waiving me off." (Capelli Dep. at 95:7-12).  He testified that Plaintiff said "fuck you, I'm home." (Id. at 95:14-17).  Capelli then told Plaintiff he was under arrest and pointed at Plaintiff. (Id. at 95:18-20).

Capelli testified that Plaintiff started walking in front of Plaintiff's vehicle. (Id. at 95:21-23).  Capelli went to grab his arm to handcuff him. (Id. at 96:2-17).  Mollik, who had been in the police car calling in the stop, came around to the passenger side of the vehicle and attempted to grab Plaintiff's other arm. (Id.)  Both Defendants testified that Plaintiff grabbed Mollik in a bear hug, and interlocked his arms around Mollik. (Id. at 96:13-17; Mollik Dep. at 52:2-10).  Capelli then punched Plaintiff in the face. (Id. at 52:15-17).  Defendants deny slamming Plaintiff down into the hood of his car. (Def. Reponses to Pl. Counterstatement of Material Facts "Def. Resp. to PSMF" at 3).

According to Defendants, Plaintiff began running towards the front door of his house. (Mollik Dep. at 52:9-21).  Mollik testified that Plaintiff swung at Capelli. (Id. at 52:23-24).  Capelli testified that "he continued to struggle with us, flailing his arms, swinging his arms wildly." (Capelli Dep. at

102:7-8).  Mollik testified that Plaintiff "took several swings at Officer Capelli," and missed. (Mollik Dep. at 53:3-6).  Both Defendants testified that Plaintiff did not hit either of them. (Id.; Capelli Dep. at 106:17-25, 107:15-21).

Defendant Capelli said he felt Plaintiff pulling on his baton. (Id. at 102:9-16).  He believed he was being disarmed and punched Plaintiff in the face once or twice. (Id. at 102:9-16). Capelli tackled Plaintiff to the ground and fell on top of him. (Id. at 104:8-13).  Mollik put Plaintiff in a chokehold or headlock.[3] (Mollik Dep. at 54:15-18).  Capelli and Mollik tried to handcuff him, and pulled on his arms. (Mollik. Dep. at 54:20-23).

When Plaintiff's family and pitbull came outside, Capelli testified that he told Plaintiff's children to "get back or I'll lock you up too and put you in juvenile detention." (Capelli Dep. at 120:14-19).  Officer Mollik testified that the pit bull was staring at him, and he was not sure if it was friendly or not. (Mollik. Dep. 55:5-12).

Plaintiff was handcuffed, searched, and placed in a squad car. (Mollik Dep. at 40:4-41:13).  At this point, the officers

---

[3] In Mollik and Capelli's Response to Pl. Counterstatement of Material facts, Defendants deny that Plaintiff was choked. ("Def. Resp. to PSMF at 4).

left the scene. (Id. at 43:10-12).  They did not search Plaintiff's car. (Mollik Dep. at 40:8-9, 43:8-22).

Plaintiff was charged with two counts of Aggravated Assault on a Police Officer, one count of Disarming a Law Enforcement Officer, one count of Resisting Arrest, and one count of Obstructing Administration of Law or other Governmental Function. (Pl. Opposition to Summary Judgment against Mollik, Capelli, "Pl. Opp. Officers" at 20).  Plaintiff was not charged with having anything hanging from his review mirror, and the Defendants did not document if they saw anything hanging from his review mirror. (See Mollik Dep. at 47:7-9).

On the first day of a trial on the indictment, the state offered to dismiss the first four counts if Plaintiff would plea to Obstructing Administration of Law or other Governmental Functions, a disorderly person's offense, for failing to get back into his car. (Def. Ex. D; Pl. Opp. Officers at 20). Plaintiff took the plea. (Def. Ex. D.)  In a colloquy with the state court judge who accepted his plea, Plaintiff answered "yes" to the question of whether he made a conscious decision not to obey the police officers. (Def. Ex. D).

Plaintiff claims that he suffered scars to his face, soft tissue injuries in his neck and back, and a torn rotator cuff as a result of the altercation with Defendants Mollik and Capelli. (Pl. Opp. Officers at 7; Pl. Ex. B).  He became depressed after

the incident, and has stopped bringing his children to sports practice and coaching their teams. (Pl. Opp. Officers at 22; Santiago Dep. at 37:1-10).

**2. The City of Vineland's Policies.**

   **a. Data collection and biased policing policies**

Plaintiff requested data on the individuals, by race, who were stopped for minor traffic stops and were not given a ticket; the individuals, by race, who were given a ticket and/or were charged with a crime, and a copy of the Department's printouts to track racial profiling, among other things. (Pl. Opp. Officers at 17).  The Defendants did not produce these materials, though Defendants have stated that records on individual traffic stops might be available. (Id.; Def. City of Vineland's Motion for Summary Judgment at 2, 5).  The City of Vineland did not start collecting and analyzing data on traffic stops that included the race/ethnicity of the individual stopped until 2013, two years after the incident. (Def. City of Vineland's Statement of Material Facts "CV SMF" at 3-4).

At the time of the incident, the City of Vineland was following the Attorney General Law Enforcement Directive No. 2005-1. (Deposition of Timothy Codispoti "Codispoti Dep." at 45:10-47-3, 50:12-15; see Bias Policy, Pl. Ex. K).  The City of Vineland, through the Department, issued General Order 16-06

implementing the provisions of the Attorney General's directive. (Id.)  The policy states that "no decision . . . to enforce or investigate any criminal or traffic offense . . . shall be based upon any bias toward any person or group of persons because of race, color. . . ."  (Id.)  Defendant Codispoti, the Police Chief, testified that officers are trained on this and all department policies. (Codispoti Dep. at 50:12-15, 50:25-51:5).

**b. Internal Affairs Investigations**

Codispoti testified that every complaint received by the department is documented and forwarded to Internal Affairs. (Codispoti Dep. at 28:23-25).  The department uses a chain of command system to review Internal Affairs complaints. (Id. at 18:21-25, 26:3-6).  Codispoti is briefed on every complaint "at some point" and said that at such briefing, he might ask questions or direct Internal Affairs to continue the investigation. (Id. at 36:4-7, 37:3-17).  He relies on officer training to ensure that the complaints make it up the chain of command and are properly investigated. (Id. at 18:21-25).  He does not personally check or have a system to audit their findings aside from "training." (Pl. Opposition to the City of Vineland's Motion for Summary Judgment "Pl. Opp. City" at 33; see Codispoti Dep. 26:1-9, 27:6-20).

Plaintiff has put forward evidence that of the 28 excessive force complaints filed in 2011, the year the incident occurred, none were sustained by Internal Affairs. (Pl. Ex. O).

## 3. The Goldsborough case

On March 2, 2011, Defendants Mollik and Capelli were also involved in a second incident involving an arrest for drug possession.  Plaintiff suggests that this incident is evidence of racial profiling. (Pl. Opp. Officers at 13-14).  Defendant Mollik wrote an incident report indicating that Mollik and Capelli saw a motor vehicle violation related to the front license plate of a car driven by Sheldon Goldsborough. (Police Report, Pl. Ex. G).  The report states that Goldsborough pulled into a parking spot and police activated their lights and siren to conduct a motor vehicle stop. (Id.)  After smelling marijuana and observing crack cocaine, the report states that Defendants arrested Goldsborough and his passenger for drug possession. (Id.)  Both Goldsborough and his passenger are black. (Pl. Opp. Officers at 13).  Cumberland County Prosecutor David Weber subsequently dismissed the indictments. (Deposition of David Weber, "D. Weber Dep." at 13:9-12).

David Weber testified that he learned of inaccuracies in the police report. (D. Weber Dep. at 16:7-21).  There was a period of elapsed time between the observation of the violation

and the police stop that was not reflected in the report. (Id. at 16:7-21, 19:8-17).  Additionally, Weber stated that he saw allegations in the defense pleadings that when the stop occurred, the car was parked in such a way that a passing officer would not have been able to see if there was violation involving the front license plate, as Defendant Mollik describes in the report. (Id. at 19:8-20:7).  Mollik testified that he and Defendant Capelli stopped another car after they saw the violation and before they approached Goldsborough's car. (Mollik Dep. at 65:21-66:10).


**4. Plaintiff's Claims**

Plaintiff has filed suit against Defendants Capelli and Mollik alleging excessive force, racial profiling, false arrest/false imprisonment, malicious prosecution, illegal search, and conspiracy under § 1983 and the New Jersey Constitution.  Plaintiff has alleged common law violations of intentional tort, negligence, and gross negligence against the Defendant officers.  Plaintiff has brought claims against the City of Vineland and Police Chief Timothy Codispoti under §1983, § 1985, § 1986, and common law negligence.  Finally Plaintiff claims that all Defendants are guilty of violating the New Jersey law Against Discrimination.

Defendants have moved for summary judgment on all counts.

**B. DISCUSSION**

**I.        Jurisdiction**

Plaintiff has brought his claims pursuant to 42 U.S.C. §
1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986, as well as pursuant to
New Jersey state law.  This Court has jurisdiction over
plaintiff's federal claims under 28 U.S.C. § 1331, and
supplemental jurisdiction over plaintiff's state law claims
under 28 U.S.C. § 1367.


**II.  Summary Judgment Standard**

Summary judgment is appropriate where the Court is
satisfied that the materials in the record, including
depositions, documents, electronically stored information,
affidavits or declarations, stipulations, admissions, or
interrogatory answers, demonstrate that there is no genuine
issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law.  Celotex Corp. v.
Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  A fact is "material" if, under the governing
substantive law, a dispute about the fact might affect the

outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**C.   Analysis**

Plaintiff has brought suit against the Defendants Mollik,
Capelli, Chief Codispoti, and the City of Vineland.  The claims
against each Defendant will be discussed in turn.

## I. Claims against Defendants Capelli and Mollik

### 1.    § 1983 and New Jersey Civil Rights Act

Plaintiff has alleged that his civil rights under the
United States Constitution and New Jersey Constitution were
violated.  The New Jersey Civil Rights Act ("NJCRA") creates a
private cause of action for violations of civil rights secured
under the New Jersey Constitution. See Trafton v. City of
Woodbury, 799 F. Supp. 2d 417, 443 (D.N.J. 2011).  "This
district has repeatedly interpreted NJCRA analogously to §
1983." Hottenstein v. City of Sea Isle City, 977 F. Supp. 2d
353, 365 (D.N.J. 2013); see also Rezem Family Associates, LP v.
Borough of Millstone, 423 N.J. Super. 103 (N.J.Super.A.D.2011).
Plaintiff's claims under the New Jersey Constitution will
therefore be combined into the § 1983 analysis.

To establish a claim under 42 U.S.C. § 1983, a plaintiff
must demonstrate a violation of a right protected by the
Constitution or laws of the United States that was committed by
a person acting under the color of state law. Nicini v. Morra,
212 F.3d 798, 806 (3d Cir. 2000).  Defendants concede that as

police officers they were acting under the color of state law.
(Def. Mollik and Capelli's Motion for Summary Judgment "Def.
MSJ" at 8.)  Plaintiff argues that he was subject to excessive
force, racial discrimination, false arrest/false imprisonment,
malicious prosecution, illegal search, and conspiracy in
violation of his rights under § 1983.

Defendants have moved for summary judgment.[4]  The Court will
deny summary judgment on the claim of excessive force and grant
summary judgment on the remaining § 1983 claims.


**a. Excessive Force**

Plaintiff has filed a § 1983 claim that he was subject to
the use of excessive force in violation of the Fourth Amendment,
and Defendants have moved for summary judgment.  When an
"excessive force claim arises in the context of an arrest or
investigatory stop of a free citizen, it is most properly
characterized as one invoking the protections of the Fourth
Amendment, which guarantees citizens the right 'to be secure in
their persons ... against unreasonable ... seizures' of the
person." Sharrar v. Felsing, 128 F.3d 810, 820 (3d Cir.
1997)(citing Graham v. Connor, 490 U.S. 386, 394 (1989)).

---

[4] Defendants Mollik and Capelli have not argued that they are
entitled to qualified immunity.

In Graham v. Connor, the Supreme Court held that excessive force should be analyzed under the Fourth Amendment and its "reasonableness" standard.  490 U.S. 386, 395 (1989).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. The Supreme Court has held that courts should consider, "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396.  The Third Circuit in Sharrar has provided additional factors for consideration, including "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Sharrar v. Felsing, 128 F.3d at 822.

Issues of disputed material facts preclude summary judgment on the question of excessive force in this case.  Plaintiff's version of the incident differs significantly from Defendants. Construing the facts in the light most favorable to the Plaintiff, Plaintiff did not pose a threat as he stood outside

his car.  A reasonable jury could find that Capelli and Mollik's actions of slamming Plaintiff into the hood of his car, punching Plaintiff repeatedly in the face, hitting Plaintiff with a hard object, placing Plaintiff in a chokehold, and manipulating Plaintiff's arms constituted excessive force.  Defendants do not deny that some force was used to arrest and subdue Plaintiff but disagree on the type of force used and claim that Plaintiff was belligerent and struggled to evade arrest, tried to seize an officers' weapon, and moved toward the house in an attempt to evade seizure.

This case therefore presents genuine issues of material facts as to the force used and the Plaintiff's conduct.  These issues are relevant to the analysis of the reasonableness of the Defendant officers' actions. See Sharrar, 128 F.3d at 820-21. Summary judgment on the excessive force claim must be denied.


**b. Racial Profiling**

Plaintiff has alleged that Defendants engaged in discriminatory racial profiling in violation of Plaintiff's Equal Protection Rights and rights under the New Jersey Constitution.  Plaintiff alleges that there was nothing hanging from his review mirror, and the only reasons that Defendants stopped him was because they saw a black man and thought he

might be involved in drugs or illegal activity.  (Pl. Opp.
Officers at 29).

　　　To prevail on his § 1983 racial profiling claim, Plaintiff
must prove that the actions of each Defendant (1) had a
discriminatory effect on him; and (2) were moved by a
discriminatory purpose. See Bradley v. United States, 299 F.3d
197, 205 (3d Cir. 2002).  To prove a discriminatory effect, a
plaintiff must "show that she is a member of a protected class
and that she was treated differently from similarly situated
individuals in an unprotected class." Id. at 206.
"Discriminatory effect may be proven by naming similarly
situated members of an unprotected class who were not selected
for the same search or, in some cases, by submitting statistical
evidence of bias." Id.

　　Plaintiff alleges that Defendants were motivated by a
racially discriminatory purpose when they stopped Plaintiff.
Plaintiff points to Mollik and Capelli's statements that they
stop individuals for motor vehicle violations in order to catch
them with illegal drugs. (Pl. Opp. Officers at 28).  The Court
does not believe that this, in and of itself, is evidence of
racial profiling.  Plaintiff argues that the testimony of
Defendant Mollik on whether or not he would stop a blue haired
old lady for a traffic violation is "absurd" and "will ring

false to a jury." (Id.)  Plaintiff's opinion on a witness's
credibility is not evidence.

Plaintiff looks to the Goldsborough case, where Mollik and
Capelli arrested Goldsborough and his passenger for drug
possession, and did not write up the report in a credible way,
to argue that Defendants engaged in racial profiling. (Pl. Opp.
Officers at 13-14).  However, there is no evidence in the record
indicating that the Goldsborough case involved racial targeting.
Even Plaintiff's expert witness, Mark Weber, a former New Jersey
police officer, stated that he "can't say that" the Goldsborough
case involved racial profiling. (See Deposition of Mark Weber
"M. Weber Dep." at 178: 5-17).  While the Goldsborough case may
pose credibility problems for the Defendants, the arrest of two
black men on the same night as the arrest of the Plaintiff is
not enough to indicate that the Defendants had a discriminatory
purpose, even if there were problems with the police report.

Moreover, Plaintiff is unable to offer evidence of
discriminatory effect.  Plaintiff's own expert
explained,"[b]ased on the materials reviewed, there was no
independent way to effectively evaluate if its officers were
engaged in any form of biased based policing. . . ." (Second
Report of Mark Weber "Second Weber" at 7).  Plaintiff argues
that he is unable to offer this evidence because the City of

20

Vineland failed to keep, analyze and produce such data. (Pl.
Opp. Officers at 24).

    This Court finds that Plaintiff's allegations are not
enough to survive a motion for summary judgment.  Plaintiff has
failed to meet his evidentiary burden, as a reasonable jury
could not find that the defendants engaged in racial profiling
on this record.  Summary judgment will be granted on the racial
discrimination claim under § 1983 and the New Jersey State
Constitution.


**c. False Arrest/Imprisonment**

    Plaintiff has brought a claim for false arrest and false
imprisonment under § 1983 and the New Jersey State Constitution.
A claim under § 1983 for false arrest/false imprisonment is
grounded in the Fourth Amendment's guarantee against
unreasonable seizures. Groman v. Twp. of Manalapan, 47 F.3d 628,
636 (3d Cir.1995).  To maintain his false arrest claims and the
attendant false imprisonment claim, the proper inquiry is
"whether the arresting officers had probable cause to believe
the person arrested had committed the offense". Dowling v. City
of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988).  "Probable
cause to arrest exists when the facts and circumstances within
the arresting officer's knowledge are sufficient in themselves
to warrant a reasonable person to believe that an offense has

been or is being committed by the person to be arrested." Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000).

Defendants argue that probable cause existed for the arrest because Defendants Capelli and Mollik observed Plaintiff refuse to get back into his car, the offense to which he ultimately pled. (Def. MSJ at 16-17).  The Court assumes that this is sufficient for probable cause, but declines to make a determination since the false arrest and false imprisonment claims are barred by Heck v. Humphrey. 512 U.S. 477(1994).

In Heck v. Humphrey, the Supreme Court held that in order to recover damages for allegedly unconstitutional arrest, imprisonment, or conviction, "a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Heck, 512 U.S. at 486-867; see also Bronowicz v. Allegheny Cty., 804 F.3d 338, 344 (3d Cir. 2015).

Plaintiff pled guilty to disorderly person's offense of obstructing the administration of law or other governmental function under N.J.S.A. § 2C:29. (Def. Ex. D).  Therefore, under Heck v. Humphrey, Plaintiff cannot maintain that he was falsely arrested and imprisoned.  Defendants are entitled to summary judgment on this claim.

22

**d. Malicious Prosecution**

Plaintiff has also alleged malicious prosecution.  To prevail on a malicious prosecution claim under § 1983, a "plaintiff must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." McKenna v. City of Philadelphia, 582 F.3d 447, 461 (3d Cir. 2009).

Plaintiff's malicious prosecution claim must fail as a matter of law because the criminal proceeding did not end in Plaintiff's favor.  A favorable termination includes: "(a) a discharge by a magistrate at a preliminary hearing, or (b) the refusal of a grand jury to indict, or (c) the formal abandonment of the proceedings by the public prosecutor, or (d) the quashing of an indictment or information, or (e) an acquittal, or (f) a final order in favor of the accused by a trial or appellate court." Donahue v. Gavin, 280 F.3d 371, 383 (3d Cir. 2002). None of the above apply to Plaintiff since he pled guilty to one of the counts in which he was charged.

While Plaintiff has suggested that the dismissal of the indictable charges as part of the plea agreement reflects a favorable outcome for the purposes of malicious prosecution, Courts of this district, including this very Court, have found otherwise. See Ferry v. Barry, 2012 WL 4339454, at *6 (D.N.J. Sept. 19, 2012).  In Ferry, the Plaintiff was initially charged with Obstructing Administration of Law, and pled to a reduced charge of violating a township ordinance for loitering. Id. at *2.  This Court held that the Plaintiff did not have a favorable termination for his a malicious prosecution claim. Id. at *6. The Court explained, "in circumstances where a criminal charge is withdrawn or a prosecution is abandoned pursuant to an agreement or compromise with the accused, the termination is viewed as indecisive and insufficient to support a cause of action for malicious prosecution." Id. (citing Gordon v. Berkeley Township Police, No. 10-5061, 2011 WL 2580473, at *5 (D.N .J. June 27, 2011.))  Even "[i]f the prosecutor drops the charges as part of a compromise with the accused, the accused will fail the favorable termination prong necessary to maintain a malicious prosecution claim under § 1983." Id.  In this case, Plaintiff similarly pled to reduced charges.  Thus, Defendants' motion for summary judgment on this issue will be granted.

**e. Illegal Search**

Plaintiff has argued that Defendants conducted an illegal search in violation of his Fourth Amendment rights.  However, Mollik and Capelli only searched Plaintiff after he was arrested, and did not search his car or home. (See Mollik Dep. at 40:4-41:13; 43:8-22).  The Supreme Court has held, "[a]mong the exceptions to the warrant requirement is a search incident to a lawful arrest. Arizona v. Gant, 556 U.S. 332, 338 (2009). Since this Court has established that Plaintiff was not falsely arrested as a matter of law, summary judgment on this claim will be granted.

**f. Conspiracy and Conspiracy under § 1985 (3)**

Plaintiff has alleged that Defendants Mollik and Capelli engaged in a conspiracy to violate Plaintiff's constitutional rights.  To sustain a conspiracy claim under § 1983, a plaintiff must show that state actors reached an understanding to deny Plaintiff his rights. Kost v. Kozakiewicz, 1 F.3d 176, 185 (3d Cir. 1993).  To constitute a conspiracy, there must be a "meeting of the minds." Startzell v. City of Philadelphia, Pennsylvania, 533 F.3d 183, 205 (3d Cir. 2008).  Plaintiff must make specific allegations of the agreement.  "[It] is a longstanding rule in the Third Circuit that a mere general allegation ... [or] averment of conspiracy or collusion without

25

alleging the facts which constituted such conspiracy or collusion is a conclusion of law and is insufficient [to state a claim]." <u>Young v. Kann</u>, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991).

Plaintiff claims that Defendants conspired to use racial profiling and excessive force, and agreed to "lie to the grand jury concerning the traffic stop and continued their outrageous and false rendition of their altercation with the plaintiff." (Pl. Opp. City at 36.)  But Plaintiff does not offer any additional evidence of conspiracy besides suggesting that the Defendants' version of events is implausible and that the Defendants are trying to cover their tracks.  Since Plaintiff does not bring forth evidence that a conspiracy existed or that any act was taken in furtherance of the conspiracy, the claim will be dismissed.

Plaintiff also brings a claim for conspiracy under 1985(3). "Section 1985(3) permits an action to be brought by one injured by a conspiracy formed 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.'" <u>Estate of Oliva ex rel. McHugh v. New Jersey</u>, 604 F.3d 788, 802 (3d Cir. 2010).  Since Plaintiff has failed to show sufficient evidence for conspiracy, including a conspiracy based on racial discrimination, summary judgment will be granted as to the § 1985 (3) claim as well.

26

**2.   Common Law Claims**

Plaintiff has also brought claims for intentional tort, reckless/gross negligence, and negligence against the Defendant officers under New Jersey common law.  Defendants Mollik and Capelli asserted the general defense of New Jersey Tort Claims Act in the answer to the complaint, but do not include the defense in their motion for summary judgment.[5]  The Court therefore assumes that Plaintiff complied with the notice provisions of the New Jersey Tort Claims Act.  Material issues of fact preclude summary judgment on these claims.

While Plaintiff's complaint states that a cause of action is for an "intentional tort," Plaintiff's opposition brief refers to "assault." (Pl. Opp. Officers at 27).  This Court assumes the intentional tort Plaintiff has alleged is assault and battery.  The Third Circuit has held that police officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force. Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995). Because this Court cannot determine if excessive force was used

---

[5] Defendants have not argued that they are entitled to the good faith defense under § N.J.S.A. 59:3-3.

at the summary judgment stage when material disputes of fact remain, the cause of action for an intentional tort may proceed.

Plaintiff also brings claims of negligence and gross negligence. For a finding of negligence under New Jersey law, the plaintiff must establish: (1) a duty of care owed by defendant to plaintiff; (2) a breach of that duty by defendant; and (3) an injury to plaintiff proximately caused by defendant's breach. Smith v. Kroesen, 9 F. Supp. 3d 439, 442-43 (D.N.J. 2014)(citing Endre v. Arnold, 300 N.J. Super. 136, 142 (App. Div. 1997)). With regard to a claim of gross negligence, "the difference between 'gross' and 'ordinary' negligence is one of degree rather than of quality. Id. "Gross negligence refers to behavior which constitutes indifference to consequences." Id.

Whether or not Defendants breached their duty of care and acted unreasonably towards Plaintiff also involves disputed issues of material fact. Summary judgment on the negligence and gross negligence claims will be denied.


**3. New Jersey Law against Discrimination**

Plaintiff alleges that Defendants violated the New Jersey Law Against Discrimination. The New Jersey Law Against Discrimination regulates more than employment; it prohibits "any agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any

of the accommodations, advantages, facilities or privileges
thereof . . . on account of the race . . . of such person . . .
." N.J.S.A. 10:5-12(f)(1).  The Court understands Plaintiff's
argument to be that he suffered discrimination at the hands of
an agent or employee of a place of public accommodation in
violation of the NJLAD.  Defendants argue that the NJLAD does
not apply to this case. (Def. MSJ at 19).

New Jersey courts have held that the NJLAD should be
construed liberally, with a purpose "nothing less than the
eradication of the cancer of discrimination." Ptaszynski v.
Uwaneme, 371 N.J. Super. 333, 345 (App. Div. 2004).  In
Ptaszynski, a suit arising out of an altercation with police in
the Plaintiffs' home, the Plaintiffs alleged that the police
officers beat and verbally abused them, because of their race,
in violation of the NJLAD. Id.  The Superior Court of New Jersey
held that the application of the LAD is not limited only to
places of public accommodation. Id.  "To have the LAD's reach
turn on the definition of 'place' is irrational because 'places
do not discriminate; people who own and operate places do.'" Id.
at 345-46.  The Superior Court found that municipal police
departments and individual police officers may be considered
places of public accommodation, and are therefore subject to the
LAD. Id.  Courts in this district have also found the NJLAD
applicable in this context. See also Anderson v. Cty. of Salem,

29

No. CIV. 09-4718, 2010 WL 3081070, at *11 (D.N.J. Aug. 5, 2010);
Delbridge v. Whitaker, No. CIVA2094227SDWMCA 2010 WL 1904456, at
*6 (D.N.J. May 10, 2010).  This Court therefore assumes, without
deciding, that the New Jersey Law Against Discrimination applies
to this case.

    Since Ptaszynski did not identify the legal standard to be
used, Courts in the District of New Jersey have held that
violations of the public accommodation provisions of the NJLAD
may be assessed under the same standards as Equal Protection
Claims in federal anti-discrimination law.  Anderson, 2010 WL
3081070, at *11; Delbridge, 2010 WL 1904456, at *6.  This Court
will therefore apply the standard used in § 1983 cases alleging
racial discrimination.  Plaintiff must allege sufficient facts
to demonstrate that Defendants' conduct "(1) had a
discriminatory effect and (2)[was] motivated by a discriminatory
purpose."  See id.; see Bradley, 299 F.3d at 205.

    As with Plaintiff's § 1983 claim for racial profiling,
Plaintiff has failed to allege sufficient facts to meet the
federal standard.  Defendant's motion for summary judgment on
the NJLAD claim will be granted.

    Plaintiff also has a NJLAD claim against Chief Codispoti
and the City of Vineland under a theory of vicarious liability.
See N.J.S.A. § 59:2-2.  Since there is not enough evidence to
maintain a cause of action against the officer defendants,

summary judgment must also be granted on the cause of action for vicarious liability under the NJLAD against the municipality and Chief Codispoti. See id.; see Jobes v. Moorestown Twp., No. CIV.A. 03-4016, 2006 WL 3000444, at *11 (D.N.J. Oct. 19, 2006)(granting summary judgment on a vicarious liability claim against the municipality when summary judgment was granted on the initial cause of action).

## II.  Claims against the City of Vineland and Chief Codispoti

### 1.  § 1983 Monell Liability Claims against the City of Vineland and Defendant Codispoti in his Official Capacity[6]

To hold the City of Vineland liable under § 1983, Plaintiff must demonstrate that his rights were violated by the City of Vineland's policy or custom. See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691(1978).  Plaintiff must show that "the municipality, through one of its policymakers, affirmatively proclaimed the policy, or acquiesced in the widespread custom, that caused the violation." Watson v. Abington Twp., 478 F.3d 144, 155–156 (3d Cir.2007).  Where the

---

[6] Count six of Plaintiff's complaint is "Failure to Train."  The Court understands the claim to be one of §1983 liability against the City and Defendant Codispoti in his official capacity. However, the claim includes statements that Codispoti and the City of Vineland were negligent in "screening hiring training, supervising disciplining and/or retaining the defendant. . . ." (Pl. Complaint at 14).  The Court will therefore address the state law negligence claim separately.

policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." Thomas v. Cumberland Cty., 749 F.3d 217, 222 (3d Cir. 2014). "[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 410 (1997.)

Municipal liability under § 1983 requires an underlying Constitutional violation. See Monell, 436 U.S. at 690-91. Without a "violation in the first place, there can be no derivative municipal claim." See Mulholland v. Gov't Cty. of Berks, Pa., 706 F.3d 227, 245 n.15 (3d Cir. 2013). Since this Court will dismiss Plaintiff's § 1983 claims against Defendants Mollik and Capelli for racial profiling, false arrest/imprisonment, malicious prosecution, and illegal search, municipal liability for these causes of action must also be dismissed. See id. Plaintiff's claim for municipal liability grounded in the constitutional violation of excessive force is the only §1983 claim that remains.

Plaintiff first challenges Defendant Codispoti's custom and policy, at the time of the incident, of not keeping data on the outcomes of traffic stops by race. Plaintiff asserts that

analysis of such data is necessary to determine if officers are
engaging in excessive force and racial profiling; Plaintiff's
expert calls the data collection "key in identifying if the
department is engaged in Biased Based Policing." (Second Weber
at 2).  However, Plaintiff has offered no evidence, beyond
conjecture, to show a causal connection between the lack of data
collection and the constitutional violation of the use of
excessive force. In Thomas v. Cumberland County, the Third
Circuit described the relevant causation inquiry for Monell
liability as whether "the injury [could] have been avoided had
the employee been trained under a program that was not deficient
in the identified respect."  749 F.3d at 226.  Plaintiff has not
shown how data collection would have avoided the injury alleged.

Plaintiff's expert, Mark Weber, argues that both video
monitoring and data on officer's use of excessive force would
"assist their supervisor[s], chain of command, and internal
affairs personnel in identifying officers that may engage in
biased based policing or excessive use of force." (Second Weber
at 7).  While the Court does not dispute that the data
collection could be helpful to officer training and supervision,
the Court does not believe this assertion from Plaintiff's
expert has established sufficient causation for Monell
liability.  Further, even if Plaintiff could prove causation,
Plaintiff has not shown that the lack of data collection rises

to the standard of deliberate indifference. See Bryan Cnty., 520
U.S. at 410.

Plaintiff's claim that the City failed to adequately train
officers regarding excessive force must fail as well.  Plaintiff
does not offer evidence on the current training or lack of
training on excessive force, nor does Plaintiff allege a pattern
of constitutional violations sufficient to put the city on
notice that the training is inadequate.[7] See Thomas, 749 F.3d at
223.  Plaintiff argues that the City of Vineland should be
collecting better data to determine if the training is
effective. (Pl. Opp. City at 28).  This too is not enough, as
the Third Circuit has held that "liability cannot rest only on a
showing that the employees 'could have been better trained or
that additional training was available that would have reduced
the overall risk of constitutional injury.'" Thomas, 749 F.3d at
226.

Plaintiff also argues that the Department's review process
for excessive force complaints was inadequate. (Pl. Opp. City at
33).  Plaintiff argues that Codispoti relies on a chain of
command structure to supervise the complaint process and
therefore does not know if the complaints are being properly

---

[7] While Chief Codispoti named the officer responsible for
training in his deposition (Codispoti Dep. at 21:2-6), there is
no evidence in the record to suggest that Plaintiff deposed him.

investigated. (Id.)  Codispoti testified that he reviews all complaints at some point, has the authority to direct Internal Affairs to continue an investigation, and relies on officer training to ensure that complaints are properly investigated. (Codispoti Dep. at 18:21-25, 36:4-7, 37:3-17).

As evidence that the Internal Affairs review is ineffective, Plaintiff points to the 28 excessive force complaints filed in 2011, observing that none were sustained by Internal Affairs. (Pl. Ex. O; Pl. Opp. City at 27).  While the Court notes that this number does seem high, Plaintiff does not bring forth information or testimony on any of the 28 excessive force complaints to prove that the review process was flawed. In addition, Plaintiff does not bring forth evidence or testimony on the inadequacy of the Internal Affairs review.[8]  In Beck v. City of Pittsburgh, where the Third Circuit held that a reasonable jury could have found a custom of tolerating the use of excessive force by police officers, the Third Circuit relied on testimony about the inefficacy of the department's review process along with "evidence of actual written civilian complaints. . . evidence that the City of Pittsburgh has no formal system in place for tracking complaints against its

---

[8]  In fact, Plaintiffs' own expert, Mark Weber, testified that he was a "proponent of the chain of command."  (M. Weber Dep. at 184:11-12).

officers and that the citizen complaints were not isolated incidents." 89 F.3d 966, 975 (3d Cir. 1996). By merely alleging that the City of Vineland's system of review was ineffective, Plaintiff has not met his evidentiary burden. Defendants' motion for summary judgment on <u>Monell</u> liability will be granted.


**2. Common Law Negligence**

Plaintiff has brought a common law claim for negligence against Codispoti and the City of Vineland for negligence in "screening hiring training supervising disciplining and/or retaining the defendant. . . ." (Pl. Complaint at 14). Plaintiff's main argument is that the City was "negligent in not having any system to track the actions of their officers to determine if anyone was engaging in racial profiling or excessive force." (Pl. Opp. City at 28).

As noted above, to sustain a prima facie case of negligence, a plaintiff must show (1) a duty of care owed by defendant to plaintiff; (2) a breach of that duty by defendant; and (3) an injury to plaintiff proximately caused by defendant's breach. See <u>Smith</u>, 9 F. Supp. 3d at 442-43. Plaintiff has not shown that a failure to collect and analyze data was a breach of the City of Vineland's duty of care. As Defendants note, Plaintiff's own expert testified that municipal police

36

departments were "not mandated" to keep such information at the time of the incident. (M. Weber Dep. at 139:15-20). Additionally, as discussed above, Plaintiff has failed to show a causal connection between the data collection and the injury alleged.  Defendants are entitled to summary judgment on this claim.

### 3. §1986

Section §1986 creates a cause of action for a knowing failure to prevent conspiratorial acts enumerated in §1985. See Chavarriaga v. New Jersey Dep't of Corr., 806 F.3d 210, 224 (3d Cir. 2015).  Defendants Codispoti and the City of Vineland argue that this claim is barred because it was not commenced within one year after the incident occurred as required by the one year statute of limitations. (Def. City of Vineland's Motion for Summary Judgment at 25; see 42 U.S.C.A. § 1986.)  The incident occurred on March 2, 2011 but the complaint was not filed until September 20, 2012.  Plaintiff's opposition brief does not address the date of commencement, nor does he respond to the argument.  Summary judgment on this claim will be granted.[9]

---

[9] Even if the claim was not barred, "transgressions of § 1986 by definition depend on a preexisting violation of § 1985."  Clark v. Clabaugh, 20 F.3d 1290, 1295 (3d Cir. 1994).  Since this

**4. § 1983 claims against Defendant Codispoti in his individual capacity**

Plaintiff brings a claim for supervisor liability under § 1983 against Defendant Codispoti.[10]  There are two theories of supervisor liability under § 1983.  First, "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004)(quotations omitted).  In addition, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." Id.

---

Court will grant all summary judgment claims of conspiracy under § 1985, there can be no § 1986 claim.  See id.

[10] The Court, construing this claim in favor of the Plaintiff, assumes that the claim is for supervisor liability against Defendant Codispoti in his individual capacity, and not a claim for municipal liability under a theory of respondeat superior. There can be no municipal liability under a theory of respondeat superior under Monell.  436 U.S. at 691.

Since there is no allegation that Defendant Codispoti was involved in the altercation, Plaintiff's allegations fit under the first theory of liability.  The Court understands Plaintiff's claim to be that Chief Codispoti failed to keep data on excessive force, and failed to use an effective internal affairs process. (Pl. Opp. City at 26-27).  Since summary judgment will be granted on municipal liability involving these very same policies, summary judgment on this claim will be granted as well.

Plaintiff's complaint also appears to include §1983 claims against Codispoti in his individual capacity for excessive force, racial profiling, false arrest/imprisonment, malicious prosecution, and illegal search.  Defendant Codispoti's motion for summary judgment on those claims will be granted, as there is no evidence that Defendant Codispoti was involved in the altercation with the Plaintiff in his personal capacity.

Similarly, to the extent that Plaintiff has also brought a claim for §1983 or §1985(3) conspiracy against Defendant Codispoti in his individual or official capacity, summary judgment will be granted.  As with Defendants Mollik and Capelli, Plaintiff does not bring forth any evidence that a conspiracy existed, or that any act was taken in furtherance of the conspiracy.

**CONCLUSION**

For the foregoing reasons, Defendant Capelli and Defendant Mollik's motion for summary judgment on Plaintiff's § 1983 excessive force claim and three common law claims will be denied. Defendant Capelli and Defendant Mollik's motion for summary judgment will be granted as to the remaining claims. Defendant City of Vineland and Defendant Codispoti's motion for summary judgment will be granted. An appropriate Order will be entered.


Date: December 28 , 2015                    s/ Noel L. Hillman
At Camden, New Jersey                NOEL L. HILLMAN, U.S.D.J.